John G. Balestriere
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:      (212) 208-2613
john.balestriere@balestrierefariello.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **SILVER SANDS MOTEL INC, JEAN JURENZIA BURDEN**, and **RICHARD TERRY KEEFE IV,** | Docket No. _____ |
| Plaintiffs, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| **LONG ISLAND CAPITAL MANAGEMENT, JERRY M. MIMS, ERIC FRIEDLANDER, PETER SCHEMBRI, and DOES 1–5,** | |
| Defendants. | |

Plaintiffs, by their attorneys, Balestriere Fariello, for their Complaint against Defendants respectfully alleges as follows upon information and belief, except as to allegations concerning Plaintiffs, which are made upon personal knowledge, and except as otherwise indicated herein:

## PRELIMINARY STATEMENT

1.      Silver Sands Motel Inc. ("Silver Sands") is a motel on Long Island that was defrauded out of at least $3 million dollars by Defendants who worked together to fraudulently induce Silver Sands's owner Jean Jurzenia Burden ("Jean Burden"), a legally blind elderly woman, into signing seven mortgages on her business and residential properties and into transferring multiple properties out of her deceased mother's estate (Estate of Florence Jurzenia ("Estate of Florence")) for the purposes of converting such mortgage proceeds into profits for Defendants and other non-parties.

2.      In so doing, Defendants are liable to Plaintiffs under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") 18 U.S.C. § § 1962(c) and (d). Under 18 U.S.C. § 1962(c), it is unlawful for any person employed or associated with any enterprise to conduct, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. Under 18 U.S.C. § 1962(d), it is unlawful for any person to engage in a RICO conspiracy.

3.      Jerry Mims ("Mims"), Jean Burden's attorney, who learned of Jean Burden's apparent wealth and vulnerabilities, used the information which he gained through his confidential relationship with Jean Burden to set up so-called hard money loans on Jean Burden's personal and commercial properties.

4.      Mims would secure these hard money loans through non-party Anthony Galeotafiore ("Galeotafiore"), a broker who connected Mims to hard money lender such as Defendant Eric Friedlander ("Friedlander"), and Friedlander's company Defendant Long Island Capital Management ("LI Capital"), Defendant Peter Schembri

2

("P Schembri"), non-party Philip Solomon ("P Solomon"), and non-party Richard Olivo ("Olivo").

5.      After securing the connections with the hard money lenders through Galeotafiore, Mims would fraudulently induce Jean Burden either by force, such as where he physically pushed Jean Burden into a room and told her that if she did not sign a mortgage she would lose everything, or by duping Jean Burden into signing mortgages which she did not understand.

6.      Mims then forced her to sign subsequent mortgages in order to pay off existing mortgages on both her personal and commercial properties, increasing hers and all Plaintiffs' damages over time.

7.      Upon receiving Jean Burden's signature on the fraudulently induced mortgages, Mims, Galeotafiore, and the hard money lenders would take portions or the totality of the profits from the mortgages for their own personal gain and apply little or nothing to the existing mortgages Jean Burden believed she was paying off, keeping Plaintiffs in a state of constant obligation to Defendants.

8.      Defendant Friedlander, P Schembri, and non-party Galeotafiore were fully aware of all of Mims's conduct.

9.      This is just the beginning of the fraud perpetrated by Defendants, as explained in further detail below.

10.     Defendants knowingly targeted Plaintiffs, as well as other known and unknown victims, with an intent to defraud them through their mortgage fraud enterprise.

11.     As a result of Defendants and non-parties fraudulently inducing Jean Burden into signing seven mortgages on her personal and commercial properties, Plaintiffs have suffered more than $3 million in damages.

12.     These damages include the funds stolen by Mims and Friedlander in various mortgages, the interest paid on the fraudulently obtained loans, and the jewelry and other valuable sentimental items which Mims forced Jean Burden to give to him in order to satisfy certain mortgages.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a), which allows the district courts of the United States jurisdiction over violations of the RICO Act, 18 U.S.C. § 1962.

14.     This Court has personal jurisdiction over the parties, as the actions which constitute the violations of 18 U.S.C. § 1962(c) and (d) were conducted in relation to the Silver Sands Motel, located at 1400 Silvermere Road, Greenport, New York 11944.

## PARTIES

*Plaintiffs*

15.     Plaintiff Silver Sands is and was an authorized New York State Corporation incorporated on March 10, 1961.

16.     Silver Sands was originally built in 1957 by Jean Burden's family and continues to operate to this day.

17.     Silver Sands is owned by the Estate of Edward Jurzenia (Jean Burden's brother), Jean Burden, and Richard Terry Keefe.

4

18.     Silver Sands Cottages are owned jointly by Jean Burden and the Estate of Edward Jurzenia and are leased to Silver Sands.

19.     Plaintiff Jean Burden is and was a resident of Suffolk County, New York, and is a 48.5% shareholder in Silver Sands.

20.     Plaintiff Richard Terry Keefe IV ("Keefe") is a resident of Suffolk County, New York, and is a 3% shareholder in Silver Sands.

*Defendants*

21.     Defendant LI Capital is and, at all times hereinafter mentioned, was a corporation duly incorporated in New York State.

22.     Defendant Friedlander is and was a resident of New York State and is and was the sole shareholder and President of LI Capital.

23.     Friedlander is a person under 18 U.S.C. § 1961(3).

24.     Unless otherwise specified, every time that Friedlander is alleged to have committed an action it is both in his individual capacity and on behalf of LI Capital.

25.     Defendant Mims was a resident of New York State.

26.     Mims is a person under 18 U.S.C. § 1961(3).

27.     P Schembri was a resident of New York State. P Schembri was a hard money lender.

28.     DOES 1–5 are other parties which Plaintiffs believe are unknown enterprise co-conspirators who will be discovered in litigation.

*Non-Parties*

29.      AJG Capital Group Associates, Inc. ("AJG") was at all times hereinafter mentioned, a corporation duly incorporated in New York.

30.      Galeotafiore was a resident of New York State, and is and was the sole shareholder of AJG. Unless otherwise specified, every time that Galeotafiore is alleged to have committed an action it is both in his individual capacity, and on behalf of AJG.

31.      Plaintiffs are not naming Galeotafiore and AJG as defendants in this action as the parties have reached a settlement, though they fully participated in the enterprise as pleaded in this complaint.

32.      Gross Family Holdings, LLC ("Gross Family") is and, at all times hereinafter mentioned, a corporation duly incorporated in the State of New York.

33.      Sal LoPiccolo ("LoPiccolo") was a resident of New York State.

34.      Plaintiffs are not naming LoPiccolo in this action as the parties have reached a settlement.

35.      Richard Olivo ("Olivo") was a resident of New York State. Olivo was a hard money lender.

36.      Gail Schembri ("G Schembri") was a resident of New York State. G Schembri is P Schembri's wife.

37.      Bonitch a/k/a Susan Sivillo ("Bonitch") was a resident of New York State. Bonitch was a mortgage broker.

38.      P Solomon was a resident of New York State. P Solomon was a hard money lender.

39.     Rosemary Solomon ("R Solomon") was a resident of New York State. R Solomon is P Solomon's wife.

40.     Plaintiffs are not naming P Solomon and R Solomon as defendants in this action as the parties have reached a settlement.

41.     The Wheatley Harbor LLC ("Wheatley") is and, at all times hereinafter mentioned, a corporation duly incorporated in the State of New York.

## STATEMENT OF FACTS

### The Creation of the Enterprise

42.     In November 2007, Mims and Jean Burden met through Bonitch, a mortgage broker who recommended that Mims handle the closing of Jean Burden's $300,000 loan with Precision Financial Services Inc. (the "Sivillo Mortgage").

43.     The Sivillo Mortgage was on Jean Burden's property at 1090 Cove Circle, Greenport, New York (the "1090 Property") and was taken to pay off a "slip and fall judgment" on the Silver Sands Motel property by Cathy Alexander, a Silver Sands patron who said she fell on the property.

44.     While it is not clear if Mims engaged in any fraud in the Sivillo Mortgage, it served as a launching pad for the creation of an enterprise aimed at defrauding Plaintiffs out of multiple properties and over $3 million.

45.     In 2008, Mims approached Jean Burden about "investing" in a real estate deal. Jean Burden told Mims that she was not interested but instead wanted to borrow a negative pledge, as she regularly did to support Silver Sands during the winter. (A

7

negative pledge is a provision in a contract which prohibits a party to the contract from creating any security interests over certain property specified in the provision.)

46.     At that time, as Florence's Estate had not yet been settled, Jean Burden could not seek such a loan from a traditional bank.

47.     In response to Jean Burden's request for a negative pledge, Mims told Jean Burden that he could help her secure a loan with LI Capital.  Mims told Jean Burden that the negative pledge was for $300,000. In fact, it was a mortgage for $750,000 (the "2008 LI Capital Mortgage").

48.     The 2008 LI Capital Mortgage was on Jean Burden's properties at 1100 Silvermere Road, Greenport, New York (the "1100 Property") and 1135 Shore Road, Greenport, New York (the "1135 Property") and was secured with Mims acting as the attorney, Galeotafiore as the mortgage broker, and Friedlander as the lender through Friedlander's LI Capital.

49.     Jean Burden suffers from ocular histoplasmosis. The condition severely impairs her vision. As such, she is unable to read documents and therefore relies on others, and had specifically relied on Mims, her attorney for several years, to read legal documents for her. However, Mims either never read the documents to Jean Burden or only summarized them and lied about their contents.

50.     As a result, Jean Burden would sign anything Mims presented to her. (Mims has since been suspended from the New York Bar for failing to maintain the required bookkeeping records for his IOLA Account.)

51.     The 2008 LI Capital Mortgage was the first time—but not the last time—that Mims, Friedlander, non-party Galeotafiore, and later P Schembri fraudulently induced Jean Burden into signing a loan on her property.

**Relationship of Members of the Racketeering Enterprise**

52.     Over the next three years, Mims, Friedlander, and non-party Galeotafiore sought other hard money lenders, such as Defendant P Schembri, and non-parties P Solomon, Olivo, Gross Family, and Wheatley, in order to continue to target Jean Burden for their own economic gain.

53.     They fraudulently induced her into signing six more mortgages (seven including the 2008 LI Capital Mortgage) by June 1, 2011, as discussed in further detail below.

54.     All involved hard money lenders benefited at Plaintiffs' expense, but, at this time, Plaintiffs are unaware of the extent to which the lenders outside of Galeotafiore, AJG, Friedlander, LI Capital, and P Schembri knew that their profits came from an illegal enterprise.

55.     This pattern of racketeering activity continued throughout each fraudulently obtained mortgage, of which there would be seven over four years.

56.     Mims followed a similar pattern with each mortgage: he would fraudulently induce Jean Burden into signing a mortgage on one of her commercial or personal properties, dupe her into signing subsequent mortgages to satisfy previously fraudulently induced mortgages, and at times put Jean Burden under physical duress.

57.     Specifically, on each occasion Jean Burden signed a new mortgage, Mims would lie to Jean Burden and tell her that her previous mortgages were being foreclosed and that, in order to save her property, she would need to sign an additional mortgage on a second property. These assertions were false: the properties were not about to be subject to foreclosure.

58.     During one instance, in December 2009, Mims pushed a crying and legally blind Jean Burden into a room and told her that she would lose everything if she did not sign the mortgage he had prepared.

59.     Mims continued, by either physically forcing Jean Burden to sign loans or duping Jean Burden into believing that she needed to sign subsequent mortgages to pay off previous ones until every property owned in part or in full by Jean Burden was encumbered by a mortgage.

60.     Many of the Silver Sands properties were still owned by the Estate of Florence with Jean Burden and Edward Jurzenia as the executors of the Estate. As such, Jean Burden was unable to transfer the properties out of the Estate and sign mortgages on them without Edward Jurzenia.

61.     To overcome that hurdle, lawyer Mims drafted fraudulent deeds to transfer properties out of the Estate of Florence and into the names of Edward Jurzenia and Jean Burden individually. Mims did so at least nine times in or around June 2009 to June 2011.

62.     As shown by handwriting experts, Edward Jurenzia's signature was forged on at least three deeds on June 15, 2009, and December 3, 2010.

63.     After each time that Jean Burden executed a mortgage prepared by Mims, Mims then worked with Galeotafiore, as his broker, to find hard money lenders for the mortgages.

64.     Galeotafiore received between $20,000 to $50,000, often through checks sent by Mims, for each mortgage in which he was involved.

65.     Friedlander through LI Capital as well as indirectly through Galeotafiore received proceeds of at times over $150,000 for the mortgages which Jean Burden was fraudulently induced into signing.

66.     P Schembri only received profits through a mortgage which Jean Burden was fraudulently induced into signing in 2011, discussed in further detail below, however, knew and knowingly participated and executed Mims, Friedlander, and Galeotafiore's fraudulent acts

67.     Galeotafiore, Friedlander, and P Schembri were aware, knowingly participated, and profited off of Mims's targeting of Jean Burden.

68.     Mims, Friedlander, P Schembri, and non-party Galeotafiore continued to target Jean Burden from May 2008 until at least December 2011 when Mims filed for bankruptcy for Silver Sands on behalf of Jean Burden, without her knowledge.

69.     Upon learning that Silver Sands's properties were listed in a foreclosure auction and that Silver Sands had filed for bankruptcy, Keefe returned to help his mother and has since worked to defend his mother, their properties, and Silver Sands against the damage caused by Defendants and the non-parties.

11

70.     Mims, Friedlander, LI Capital, and P Schembri acted in association-in-fact and each were fully aware that all of their acts were illegal.

71.     Below is a detailed account of every mortgage which Jean Burden was fraudulently induced into signing. Unless stated otherwise, enterprise participants Mims and Galeotafiore engaged in the fraudulent steps noted above with regard to each of the below mortgages.

72.     If Friedlander and his LI Capital were involved in a LI Capital mortgage they were aware of Mims's and Galeotafiore's misconduct.

73.     Where P Schembri was involved in a mortgage, he was aware of Mims, Galeotafiore, and Friedlander's misconduct.

## Relevant Mortgages

*Long Island Capital – May 9, 2008*

74.     On or about May 9, 2008, Mims arranged a mortgage and security agreement for Jean Burden and Edward Jurzenia, as mortgagors, and LI Capital, as mortgagee.

75.     The 2008 LI Capital Mortgage was allegedly executed by Jean Burden and Edward Jurzenia individually.

76.     Jean Burden does not recall executing the 2008 LI Capital Mortgage.

77.     The mortgaged properties were the 1100 Property and the 1135 Property.

78.     Jean Burden believed the mortgage was for $300,000 and that she was taking a negative pledge.

79.     The mortgage was actually in the amount of $750,000.

12

80.     AJG was the mortgage broker, despite not being Jean Burden's broker and instead brokering the loan without a license on behalf of Friedlander.

81.     Pursuant to the closing statement produced by Friedlander in December 2012, the following distributions were made from the proceeds of the 2008 LI Capital Mortgage:

| | | |
|---|---|---|
| a. | Escrow Check to LI Capital | $157,500 |
| b. | Escrow Check to AJG Capital Group for Points | $22,500 |
| c. | Escrow Check to Certilman Balin Adler & Hyman, LLP | $9,000 |
| d. | Escrow Check to Elizabeth Reis | $400 |
| e. | Escrow Check Excel Abstract, Inc. | $47,837.44 |
| f. | Escrow Check to Wire Transfer to IOLA Account of Mims: | $512,762.56 |

*Solomon Mortgage – November 13, 2008*

82.     On or about November 13, 2008, Mims arranged a mortgage between P Solomon, as mortgagee, and Silver Sands, as mortgagor (the "2008 Solomon Mortgage").

83.     The mortgage was only executed by Jean Burden in her individual capacity.

84.     Jean Burden believed she was taking a small negative pledge for $30,000 and does not recall executing the 2008 Solomon Mortgage.

85.     The mortgaged property was 1400 Silvermere Road, Greenport, New York (the "1400 Property").

86.     In order for Silver Sands to transfer or mortgage any interest or asset of Silver Sands, including the 1400 Property, a corporate resolution authorizing such transfer by a majority of shareholders is required.

87.     There was no corporate resolution for Silver Sands approving the mortgaging of the 1400 Property.

88.     Jean Burden, Edward Jurzenia, and Keefe were the only members of Silver Sands at this time.

89.     The mortgaged amount was $200,000.

90.     Mims received a check for the entirety of the $200,000 proceeds

91.     Plaintiffs have separately settled with P Solomon and R Solomon (collectively, the "Solomons") and are therefore not pursuing claims against the Solomons here.

*Long Island Capital – June 24, 2009*

92.     On or about June 24, 2009, Mims arranged a security agreement and mortgage between Edward Jurzenia, Jean Burden, and Silver Sands, as mortgagors, and LI Capital, as mortgagee (the "2009 LI Capital Mortgage").

93.     The 2009 LI Capital Mortgage was executed by Jean Burden, in her alleged capacity as Secretary-Treasurer of Silver Sands, Jean Burden, as an individual, and Jean Burden as attorney-in-fact for Edward Jurzenia.

94.     The execution of the 2009 LI Capital Mortgage by Edward Jurzenia is devoid of any information identifying any authorization of power-of-attorney to Jean Burden as agent.

95.     The 2009 LI Capital Mortgage was signed by Friedlander, as an individual, who was identified as the President of LI Capital.

14

96.     A search of the recorded documents found an alleged power-of-attorney for Edward Jurzenia was signed on these properties, allegedly executed on June 23, 2009, one day prior to the entering of the mortgage.

97.     As proven by handwriting experts, Edward Jurzenia's signature on the power-of-attorney is forged.

98.     Similar to the 2008 Solomon Mortgage, there is no corporate resolution to approve the mortgaging of the 1400 Property from Silver Sands.

99.     There was an attempt to forge Edward Jurzenia's signature on the corporate resolution.

100.    The properties mortgaged were: 73550 Route 25, Greenport New York (the "73550 Property"); 1155 Silvermere Road, Greenport, New York (the "1155 Property"); the 1400 Property; the 1100 Property; and the 1135 Property.

101.    The mortgaged amount was $900,000.

102.    AJG was the broker involved in the 2009 LI Capital Mortgage.

103.    Pursuant to the closing and disbursement statement, the following disbursements were made from the $900,000 proceeds:

| | | |
|---|---|---:|
| a. | LI Capital's Prepaid Interest and Origination Points | $361,833.33 |
| b. | Escrow Check to AJG Capital Group | $49,500 |
| c. | Escrow Check to Certilman, Balin, Adler, Hyman, LLP | $15,100 |
| d. | Escrow Check to Philip Solomon | $203,188.98 |
| e. | Escrow Check to Somer Estrin | $250 |
| f. | Escrow Check to Sheriff of Suffolk County | $19,307.84 |
| g. | Escrow Check to Patricia Chessman | $350 |
| h. | Escrow Check to Brightwaters Abstract, Inc. | $30,371.85 |
| i. | Payment to Jean J. Burden | $85,371.85 |
| j. | Escrow Check to Mims | $135,000 |

104.    AJG received $49,500 from the proceeds of the mortgage.

105.    The 2009 LI Capital Mortgage was foreclosed in August 2010. Mims filed a five-line answer to the Summons and Complaint, in which Jean Burden's signature was forged and notizarized by Mims, and then failed to defend the motion for summary judgment, resulting in a default judgment being rendered on December 13, 2010.

*Solomon Mortgage – December 15, 2009*

106.    On or about December 15, 2009, Mims arranged a mortgage with the Solomons, as mortgagees, and Walter Burden (Jean Burden's husband) and Jean Burden, as mortgagors (the "2009 Solomon Mortgage").

107.    The mortgage was executed by Jean Burden, individually and Jean Burden as attorney-in-fact for Walter Burden.

108.    Walter Burden's signature was forged on the power-of-attorney documents (the "2010 Forged Walter POA").

109.    The properties mortgaged were: 1000 Cove Circle, Greenport, New York (the "1000 Property") and 1090 Cove Circle, Greenport, New York (the "1090 Property").

110.    Pursuant to the mortgage documents, the 1000 Property was added to the security agreement at the execution of the mortgage.

111.    Jean Burden was told by Mims and Somer Estrin (P Solomon's Attorney) ("Estrin") that the 1000 Property would be removed from the mortgage immediately.

112.    The 1000 Property was never removed from the 2009 Solomon Mortgage.

113.    The mortgaged amount was $550,000.

114.   The following checks were made from the proceeds of the 2009 Solomon Mortgage.

    a.   Payment to Mims                            $76,000
    b.   Payment to Estrin                             $4,750

115.   Plaintiffs have separately settled with P Solomon and R Solomon and are therefore not pursuing claims against the Solomons in this action.

***The Gross Family Holdings, LLC and The Wheatley Harbor, LLC – December 13, 2010***

116.   On or about December 13, 2010, Mims arranged a mortgage between the Gross Family Holdings LLC and the Wheatley Harbor, LLC, as mortgagees (the "Gross/Wheatley Mortgage"), and Jean Burden and Edward Jurzenia, as mortgagors.

117.   The mortgage was executed by Jean Burden, individually, and Jean Burden as attorney-in-fact for Edward Jurzenia, despite the fact that there was no power-of-attorney for Edward Jurzenia

118.   Jean Burden does not recall executing the Gross/Wheatley Mortgage.

119.   The properties mortgaged were 1220 Silvermere Road, Greenport, New York (the "1220 Property") and 73700 Route 25, Greenport, New York (the "73700 Property").

120.   Galeotafiore received an undisclosed portion of the proceeds as broker.

121.   The Gross/Wheatley Mortgage was satisfied approximately three months later with the Schembri Mortgage (below).

122.   The mortgage amount was $250,000.

123.    The following wire transfers and checks were written from the proceeds of the Gross/Wheatley Mortgage:

    a.   Payment to Mims                                     $126,226.17
    b.   Payment to Jean Burden                             $100,000

*Peter Schembri Mortgage – April 18, 2011*

124.    On or about April 18, 2011, Mims arranged a mortgage between P Schembri and G Schembri, as mortgagees, and Edward Jurzenia, Jean Burden, and Walter Burden, as mortgagors (the "Schembri Mortgage").

125.    P Schembri was an acquaintance of Galeotafiore, who had shown an interest in developing Silver Sands for many years.

126.    P Schembri, Friedlander, and Galeotafiore planned for P Schembri to take over Friedlander's loan as two of the parcels obtained in the Schembri mortgage connected the previously encumbered parcels, thus giving Schembri control over a connected and majority share of Silver Sands properties.

127.    Jean Burden was particularly resistant to signing any mortgages with P Schembri as she knew of his ultimate goal to develop the Silver Sands land.

128.    Nonetheless, Mims fraudulently induced Jean Burden, by falsely telling her that the Gross/Wheatley Mortgage was in default, into signing the Schembri Mortgage.

129.    The mortgage was executed by Edward Jurzenia and Walter Burden with Jean Burden as attorney-in-fact for both parties, and by Jean Burden individually.

130.    Walter Burden's signature on the power-of-attorney documents was forged (the "2011 Forged Walter POA").

131.    There was no existing power-of-attorney for Edward Jurzenia.

132.    The properties mortgaged were the 1220 Property, the 73700 Property, 860 Cove Circle, Greenport, New York (the "860 Property"), and 750 Cove Circle, Greenport, New York (the "750 Property").

133.    The mortgaged amount was $400,000.

134.    Galeotafiore, AJG, PM Advisory, a company owned by LoPiccolo, and LoPiccolo acted as brokers.

135.    The following checks were written from the proceeds of the Schembri Mortgage:

| | | |
|---|---|---|
| a. | Mims | $48,550 |
| b. | PM Advisory Group | $14,000 |
| c. | Anthony Galeotafiore/AJG Capital | $20,000 |
| d. | To Pay off the Wheatley/Gross Mortgage | $250,000 |
| e. | Northstar Title Agency | $22,652.77 |
| f. | RMC Consulting | $8,000 |

*Richard Olivo – June 1, 2011*

136.    On or about June 1, 2011, Mims arranged a mortgage between Richard Olivo, as mortgagee, and Walter Burden and Jean Burden as mortgagors (the "Olivo Mortgage").

137.    Mims fraudulently induced Jean Burden into signing the Olivo Mortgage by telling her that it was necessary to satisfy the 2009 LI Capital Mortgage and was promised by Friedlander, LoPiccolo, and Galeotafiore that the Olivo Mortgage would pay the 2009 LI Capital in full.

138.    The mortgage was executed by Jean Burden individually and Walter Burden with Jean Burden acting as attorney-in-fact for Walter Burden.

139.    The 2011 Forged Walter POA was used again.

140.    The mortgaged property was 308 Flint Street, Greenport, New York 11944 (the "308 Property").

141.    The mortgaged amount was $550,000.

142.    Mims received $492,554.89 from the proceeds.

143.    Mims wired $395,291.72 to LI Capital for a three-month forbearance of a foreclosure of the 2009 LI Capital Mortgage.

144.    LoPiccolo and Galeotafiore acted as mortgage brokers and were paid from the existing mortgage.

145.    Friedlander faxed Jean Burden a letter on May 25, 2011, stating that the LI Capital Mortgage was paid in full and that the auction had been canceled.

146.    The $550,000 paid by Jean Burden only satisfied about a year's worth of interest on the LI Capital Mortgage, resulting in Friedlander placing the LI Capital Mortgage Property up for auction three months later.

**<u>Keefe First Learns of the Fraud</u>**

147.    Keefe, Jean Burden's son, eventually learned, while researching Silver Sands Motel, that Silver Sands had filed for bankruptcy.

148.    After finding out that his family company had filed for bankruptcy, Keefe returned home to help his mother.

149.    Eventually, Keefe, on behalf of his mother and Silver Sands, started litigations against Mims and began defending foreclosures of the mortgages which Jean Burden was fraudulently induced into signing against the Solomons and LI Capital.

150.    While fending off individual foreclosures, Keefe did not learn at first of the extent of the racketeering enterprise, including the relationship between Galeotafiore and Friedlander.

151.    This changed when Galeotafiore was deposed on March 9, 2017, and March 23, 2017 (the "March 2017 Depositions").

152.    At that time, Keefe and Jean Burden discovered that Galeotafiore was acting as an unlicensed broker on behalf of Friedlander and LI Capital.

153.    Keefe and Jean Burden also confirmed through the March 2017 Depositions the link between Galeotafiore, Friedlander, and Mims.

154.    Before the March 2017 Depositions, Keefe was unaware of the extent the enterprise conspired to defraud Plaintiffs of their family company and properties.

**Other Fraudulent Acts Perpetrated by Defendants and Non-Parties**

155.    Since discovering the fraud perpetrated by Defendants, Plaintiffs have investigated further business engagements entered into by Friedlander and Galeotafiore and have uncovered that Friedlander and Galeotafiore have continued a string of fraudulent acts beyond the State of New York.

156.    As an example, between 2008 and 2012, Friedlander forced the foreclosure of Sunset Lake Villas Condos in Florida.

157.    Galeotafiore owned numerous properties in Sunset Lake Villas Condos which he purchased in part with a $4 million loan from Compass Bank.

158.    When Compass Bank threatened foreclosure, as Galeotafiore was unable to pay back the loan, Friedlander paid the loan.

159.    Friedlander then foreclosed on the condo complex, a transaction which Galeotafiore did not defend and later described to be "amongst friends."

160.    Friedlander assigned the foreclosure judgment to AJG Realty, a Florida corporation and subsequently transferred AJG Realty to Galeotafiore and Americo Magalhaes ("Magalhaes") (Galeotafiore's business partner in various development schemes, as described in further detail below).

161.    AJG Realty then foreclosed on or bought the remaining condos, obtained a majority in the condo association, and voted to terminate the condo association and turn the properties into apartments.

162.    Through the Florida scheme, Friedlander and Galeotafiore defrauded many Floridians out of their homes.

### Further Fraud Closer to Home

163.    Jim Calabrese ("Calabrese"), another victim of Galeotafiore and Friedlander, met Galeotafiore in 2012.

164.    In July 2013, Galeotafiore, Friedlander, and Magalhaes agreed to invest $500,000 each into Calabrese's development project.

165.   For the purposes of this project, Calabrese made Galeotafiore a member of the LLC previously created by Calabrese to hold the property (the "Parkview at Salisbury LLC").

166.   Calabrese owned property and had approval for building 30 condominium units. He was waiting for the permit process to conclude in order to build thirty condominiums.

167.   Galeotafiore convinced Calabrese to sign a further loan for $1.5 million with his friend Thomas Gubitosi's ("Gubitosi") company, Marie Holdings Inc.  (the "Marie Holdings Loan").

168.   While Calabrese was in the process of looking for more lenders, and without missing any loan or interest payments on the Marie Holdings Loan, Marie Holdings filed a default and foreclosed on Calabrese and Galeotafiore's LLC.

169.   In order to avoid foreclosure and thereby losing his entire life savings, Calabrese agreed to meet with Galeotafiore and Guibitosi.

170.   During this meeting, Galeotafiore told Calabrese that he needed to take out a second loan with AJG Parkview at 83% interest and a 12% interest compounded monthly (the "AJG Parkview Loan").  AJG Parkview was Friedlander, Magalhaes, and Galeotafiore's company and a member of the Parkview at Salisbury LLC.

171.   Friedlander supplied AJG Parkview with $1.5 million of the funds provided to Calabrese in the AJG Parkview Loan.

172.     A condition of Calabrese signing the AJG Parkview loan was that Marie Holdings would renew the building loan and end the default and foreclosure the following day.

173.     After signing the AJG Parkview loan, Calabrese began looking for new lenders to pay off Marie Holdings and AJG Parkview.

174.     Upon learning that Calabrese was looking for new lenders, Gubitosi, Galeotafiore, and Friedlander, through Marie Holdings, carried over the 24% default interest on the Marie Holdings Loan that carried over for months, with Gubitosi repeatedly threatening Calabrese with foreclosure.

175.     Rather than help the Parkview at Salisbury LLC, which he was a member of, Galeotafiore did nothing. Gubitosi has admitted since, in depositions, that there was no basis for filing the default and foreclosure.

176.     Gubitosi has since admitted in depositions that they found victims to sign loans with Marie Holdings, defaulted on those loans and brought them into foreclosure, resulting in the owners losing their properties and life savings.

## Damages

177.     As a result of Defendants' conduct, Plaintiffs have suffered over $3 million in damages.

178.     The $3 million in damages includes, but is not limited to, the funds that were stolen from the mortgages, the interest paid on the mortgages, and the jewelry and family heirlooms which Mims took from Jean Burden in order to reverse the involuntary bankruptcy, which he filed on behalf of Silver Sands without Jean Burden's knowledge.

24

## Specific Allegations of Fraud Against the Defendants

179.     From no later than May 2008 and continuing until at least January 2012, on at least seven occasions, the association-in-fact enterprise of Mims, Friedlander individually and through his ownership of LI Capital, P Schembri, and Galeotafiore engaged in at least the following predicate acts in furtherance of the enterprise, fully aware that each of the acts were both illegal and would advance the cause of the enterprise at the expense of Plaintiffs. The predicate acts in furtherance of the enterprise include:

a. Forging deeds to transfer properties out of the Estate of Florence and into the names of Edward Jurzenia and Jean Burden individually;

b. Forging power-of-attorney documents for Edward Jurzenia to enter into mortgages on behalf of Edward Jurzenia and Jean Burden on the properties formerly in the Estate of Florence;

c. Fraudulently inducing Jean Burden into signing seven mortgages on her personal and commercial properties through physical force and by creating a situation whereby she needed to sign subsequent mortgages to satisfy previously fraudulently induced mortgages; and

d. Filing for bankruptcy on behalf of Silver Sands without the consent or knowledge of the Plaintiffs and only withdrawing the filing in

February 2012, after Jean Burden gave Mims approximately $100,000 in jewelry and family heirlooms.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### (Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))
### (RICO Enterprise)

180.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein, as well any allegations in the attached RICO Statement.

181.    All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), as persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's through a pattern of racketeering activity or collection of unlawful debt to the detriment of the Plaintiff.

182.    At all times relevant to these allegations, all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

183.    At all times relevant, Defendant Friedlander and non-party Galeotafiore had an ongoing business relationship in which they worked together as brokers and lenders to develop properties in New York and Florida.

184.    This business relationship was used to fraudulently induce vulnerable people, such as Jean Burden, into signing mortgages on their properties for the purposes of converting such mortgages into profits.

185.    Defendant Mims and Defendant P Schembri agreed to join the conspiracy, acted in furtherance of the conspiracy, and knowingly participated in a pattern of racketeering.

186.    In their intentional scheme to defraud Plaintiffs, Defendants engaged in activities which constitute "racketeering activity," including wire fraud and mail fraud within the meaning of 18 U.S.C. § 1961(1).

187.    Fraudulently inducing Jean Burden into signing seven mortgages between 2007 and 2011 resulted in multiple predicate acts and a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

## SECOND CAUSE OF ACTION
### (Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)) (RICO Conspiracy)

188.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein, as well as any allegations in the attached RICO Statement.

189.    All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), as persons who have conspired to violate 18 U.S.C. § 1962, to the detriment of the Plaintiffs.

190.    At all times relevant to these allegations, all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

191.    Defendant Friedlander conspired to use his company LI Capital to defraud Plaintiffs. All Defendants conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) by associating in fact to create an enterprise which

then engaged in a pattern of racketeering activity to defraud and damage Plaintiffs with at least predicate acts of mail fraud and wire fraud.

192.    The period of conspiracy to defraud Plaintiffs may have begun as early as May 2008, when Mims fraudulently induced Jean Burden into signing the 2008 LI Capital Mortgage.

193.    By November 2008, the conspiratorial plans were in motion as Defendants fraudulently induced Jean Burden into signing a second mortgage over Silver Sands Motel with P Solomon.

194.    The pattern of racketeering activity continued until 2011 and included mortgages which Jean Burden was fraudulently induced into signing.

195.    The object of the conspiracy was to defraud Jean Burden and Silver Sands into paying hard money lender loans.

196.    The enterprise damaged Plaintiffs by at least $3 million.

### **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court enter judgment in Plaintiff's favor and against Defendant, awarding:

A.  On the First and Second Causes of Action, Plaintiffs' damages resulting from Defendants' violation of the Racketeer Influenced and Corrupt Organizations Act;

B.  Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

C.  Applicable interest on the foregoing amount;

D.  Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1964(c); and

E.  Any and all other relief the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury for all issues so triable in this action.

Dated: New York, New York
        March 8, 2021

By: _____
    John G. Balestriere
    **BALESTRIERE FARIELLO**
    225 Broadway, 29th Floor
    New York, New York 10007
    Telephone:    (212) 374-5401
    Facsimile:    (212) 208-2613
    john.balestriere@balestrierefariello.com
    *Attorneys for Plaintiffs*